# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| NEIL W. LEVIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13 C 8102 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| THE POSEN FOUNDATION, FELIX POSEN, and JAMES E. YOUNG, | ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Neil W. Levin filed suit alleging breach of implied contract and copyright infringement against The Posen Foundation and common law fraud against The Posen Foundation, Felix Posen, and James E. Young. Young moved to dismiss claims against him for lack of personal jurisdiction.[1] (Dkt. 16.) Because Young is protected by The Posen Foundation's fiduciary shield, his motion to dismiss is granted.

## BACKGROUND FACTS[2]

### I.    The Parties

Levin is a scholar of Jewish music who, among other things, teaches at the Jewish Theological Seminary of America in New York City. (Dkt. 1 ("Compl.") ¶ 4B.) He is a resident

---

[1] The Posen Foundation and Posen jointly moved to dismiss for lack of personal jurisdiction and for failure to state a claim upon which relief may be granted, but the court suspended briefing until after the resolution of this motion. (*See* dkt. 39.)

[2] Unless otherwise indicated, the following facts are taken from the complaint and are presumed true for the purpose of resolving the pending motion. *See, e.g., Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). In addition to the complaint, the court can consider declarations outside of the pleadings submitted by defendants challenging personal jurisdiction. *See, e.g., Purdue Research Found.* v. *Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).

of Illinois and maintains an apartment in New York where he stays while teaching at the Seminary. (Dkt. 22, ex. 1 ("Levin Decl.") ¶¶ 10-11.)

Posen is the founder and president of The Posen Foundation ("the Foundation"), a Swiss equivalent of a not-for-profit corporation, with offices in New York. (Compl. ¶ 5.) One of its projects is *The Posen Library of Jewish Culture and Civilization* ("the Library"), a ten-volume collection of Jewish literature, artwork, and artifacts selected by scholars. (Dkt. 17, ex. 1 ("Young Decl.") ¶ 1.)

Young serves as editor-in-chief of the Library for which he receives an annual salary of $18,000. (*Id.* ¶ 10.) In addition, he is a Professor of English and Judaic Studies and the Director of the Institute for Holocaust, Genocide, and Memory Studies at the University of Massachusetts, Amherst. (*Id*. ¶ 1.) Young resides in Massachusetts and has never resided or owned any real property in Illinois.[3] (*Id* ¶ 4.) He has travelled to Illinois twice in the past ten years to attend conferences unrelated to the Library or to Levin. (*Id.*) His last visit was approximately five years ago. (*Id.*) He never met with Levin in Illinois. (*Id.* ¶ 7.) All of his contacts with Levin "were in furtherance of [his] role as Editor in Chief of the *Posen Library* and at the direction of the Posen Foundation and Felix Posen." (*Id.* ¶ 6.)

## II. Levin's Dealings with the Library

In November 2008, Joyce Rappaport, the executive editor of the Library, met with Levin to discuss potential music contributions to the Library. (Compl. ¶ 6.) Rappaport engaged Levin to evaluate the music that would accompany Volume X of the Library. (*Id.*) Levin met with Posen the next month and Posen asked Levin to provide further services to the Library, including evaluating the potential for a separate volume devoted solely to Jewish music, which Posen

---

[3] Young also has never paid taxes to, or had an office, bank account or phone number in Illinois. (Young Decl. ¶ 4.)

2

suggested Levin would edit. (*Id.* ¶¶ 7-8.) At Posen's direction, Levin met with Young in February 2009 to discuss his contributions to the Library. (*Id.* ¶ 13.) Over the next two years, Levin regularly communicated with Posen, Young, Rappaport, and other employees of the Foundation and provided a substantial amount of material to the Library.

In October 2010, Young emailed Levin and asked him to cut his Volume X submissions significantly. (*Id.* ¶ 52.) Levin refused to shorten his materials but agreed to let the Library use his work if it paid him appropriately and confirmed that his name would not appear in the volume. (*Id.* ¶¶ 55-56.)

### III.  Young's Fraudulent Communications with Levin

Levin first alleges that Young knowingly misrepresented and concealed the space limitations in Volume X, causing him to expend time and energy to work that would only be marginally utilized, and that Levin would not have continued working had he known of the limitations. (*Id*. ¶¶ 62, 64.) Levin further alleges that Young falsely represented that Levin's work product would not be used unless he was paid for it. (*Id.* ¶ 62.) Finally, Levin claims that Young's statements "lulled" him into a false state of "happy anticipation" of his future with the Library. (*Id.* ¶¶ 66, 71.) He cites a total of eighteen communications via telephone, fax or email that he had with Young between February 2009 and February 2011. (*See generally* Compl.; *see also* Levin Decl. ¶ 18.)

Levin specifically lists six misrepresentations made by Young. First, on February 4, 2009, at a meeting in New York, Young told Levin that the Library would contain a stand-alone volume devoted to music that would be compiled and edited by Levin. (Compl. ¶¶ 14, 62F.) This promise was reaffirmed by Young at a May 2009 meeting in Connecticut and in a February 2011 email that stated, "In time, we hope very much that you'll consider editing a stand-alone

3

volume of essays . . . . Once we paid your invoice, I hope we can restart a conversation on what kind of volume this might be." (*Id.* ¶¶ 18, 21, 59C.)

The second, third, and fourth misrepresentations occurred in an email sent by Young to Posen, copying Levin, in May 2009. The email memorialized a meeting between Young and Levin that occurred a few days before. In the email, Young stated that they had agreed that Levin would receive a consulting fee "consistent with his contributions to the project." (*Id.* ¶¶ 22, 62A.) Young also stated that they would work together to meet the page limit and would shorten other entries or divide Volume X if necessary. (*Id.* ¶¶ 23, 62B.) Young noted that he would share this information with the Volume X editors. (*Id*. ¶¶ 23, 62C.)

The fifth alleged misrepresentation occurred in March 2010 when Young responded to Levin's inquiry about page limits. Young stated, "Once we have a draft in hand we'll know how to proceed."[4] (*Id.* ¶ 46, 62D.)

Sixth, Young emailed Levin in April 2010 stating that Levin's submissions were "exactly what we were hoping for" and asked him to "continue in this vein." (*Id.* ¶¶ 47, 62E.) Young also warned Levin that about 20 percent of the material could have to be cut. (*Id*.)

**LEGAL STANDARD**

Rule 12(b)(2) permits dismissal of a claim based on lack of personal jurisdiction over the defendant. *See* Fed. R. Civ. P. 12(b)(2). The party asserting personal jurisdiction bears the burden of proof. *See Purdue Research Found.* v. *Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). In considering a motion to dismiss for lack of personal jurisdiction, the court may review affidavits submitted by the parties. *Id.* at 782. When the court rules on the motion without a hearing, the plaintiff need only establish a *"prima facie* case of personal jurisdiction."

---

[4] It is not clear what form this communication took. The complaint indicates that Young wrote this statement, but Levin's declaration lists the March 2010 communication as a "TFC," which the court assumes is a telephone call. (*Compare* Compl. ¶¶ 46A-B, *with* Levin Decl. ¶18A.)

4

*Id.* (quoting *Hyatt Int'l Corp.* v. *Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). The court will "read the complaint liberally, in its entirety, and with every inference drawn in favor of" the plaintiff. *Cent. States, Se. & Sw. Areas Pension Fund* v. *Phencorp Reins. Co.,* 440 F.3d 870, 878 (7th Cir. 2006) (quoting *Textor* v. *Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1393 (7th Cir. 1993)). Disputes concerning relevant facts are resolved in favor of the plaintiff. *Purdue,* 338 F.3d at 782.

## ANALYSIS

**I.    Personal Jurisdiction**

The court, sitting in diversity, has personal jurisdiction over Young to the extent that an Illinois court could exercise such jurisdiction. *See Philos Techs., Inc.* v. *Philos & D, Inc.*, 645 F.3d 851, 855 n.2 (7th Cir. 2011). Illinois allows for personal jurisdiction to the extent authorized by the Fourteenth Amendment's due process clause, which merges the federal constitutional and state statutory inquiries. *See N. Grain Mktg, LLC* v. *Greving*, 743 F.3d 487, 491 (7th Cir. 2014); *Tamburo* v. *Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); *see also* 735 Ill. Comp. Stat. 5/2–209(c). Under the Illinois long-arm statute, personal jurisdiction may be general or specific. *uBid, Inc.* v. *GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010).

**A.    General Jurisdiction**

General jurisdiction is a demanding standard under which a defendant only can be haled into an Illinois court if he has "'continuous and systematic general business contacts' with the forum state." *uBid*, 623 F.3d at 425-26 (quoting *Helicopteros Nacionales de Colombia, S.A.* v. *Hall,* 466 U.S. 408, 415-16, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)). The facts of this case do not suggest that Young's contacts with Illinois meet this standard, nor does Levin argue that general jurisdiction applies. (*See* dkt. 22 at 13 n.1.)

5

B.    **Specific Jurisdiction**

Specific jurisdiction grows out of "the relationship among the defendant, the forum, and the litigation." *Walden* v. *Fiore*, --- U.S. ---, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (quoting *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L.Ed.2d 790 (1984)). This type of jurisdiction requires that "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state and (2) the alleged injury arises out of the defendant's forum-related activities." *N. Grain Mktg.*, 743 F.3d at 492 (quoting *Tamburo*, 601 F.3d at 702). "The exercise of specific jurisdiction must also comport with the traditional notions of fair play and substantial justice." *Id.* (citing *Tamburo*, 601 F.3d at 702).

1.    **Whether Young's Activities Were Purposefully Directed At Illinois**

The question of whether a defendant purposefully directed activities at a forum "depends in large part on the type of claim at issue." *Felland* v. *Clifton*, 682 F.3d 665, 674 (7th Cir. 2012). Levin asserts fraud, an intentional tort. *See*, *e.g.*, *Trading Techs., Int'l, Inc.* v. *CQG, Inc.*, No. 05 C 4811, 2014 WL 1977029, at *4 n.3 (N.D. Ill. May 9, 2014). With respect to an intentional tort, the inquiry "focuses on whether the conduct underlying the claim[ ] was purposefully directed at the forum state." *Felland*, 682 F.3d at 674 (alterations in original) (quoting *Tamburo*, 601 F.3d at 702). Courts look to whether the defendant engaged in (1) intentional and allegedly tortious conduct, (2) expressly aimed at the forum state, (3) with the knowledge that such conduct would injure the plaintiff in the forum state. *Tamburo,* 601 F.3d at 703 (citing *Calder* v. *Jones,* 465 U.S. 783, 789, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)). "The defendant's conduct and connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there." *N. Grain Mktg.*, 743 F.3d at 492.

Young first argues that he could not have intended to affect an Illinois interest because he was not aware that Levin lived in Illinois. In response, Levin provides an affidavit stating that he informed Young that he lived in Illinois, provided his Illinois contact information to Young, and told Young that his administrative assistant monitors his email account and faxes any incoming emails to his home office in Highland Park, Illinois. (Levin Decl. ¶¶ 7-9.) Since controverted facts are resolved in Levin's favor for the purpose of this motion, the court finds that Levin has sufficiently alleged and supported the contention that Young was aware that Levin resided in Illinois. *See Purdue*, 338 F.3d at 782 ("[T]he plaintiff is entitled to have any conflicts in the affidavits (or supporting materials) resolved in its favor."). Thus Young's first argument fails.

Young also argues that the court cannot exert personal jurisdiction over Young solely on the basis of emails to an Illinois resident. The Seventh Circuit has explained, however, that emails may be properly considered in minimum contacts analyses, especially if they were purposefully sent to a forum resident knowing that they would "most likely" be read in the forum. *Felland*, 682 F.3d at 676 n.3; *see also Triad Capital Mgmt., LLC* v. *Private Equity Capital Corp.*, No. 07 C 3641, 2008 WL 4104357, at *5 (N.D. Ill. Aug. 25, 2008) ("[E]ven when contact takes place only via telephone or email, it can create a substantial connection between the defendant and the forum state[.]"). As Young's communications into Illinois contained the allegedly fraudulent and misleading information on which Levin bases his claim, they are sufficient to constitute activities purposefully directed at Illinois.

### 2. Whether Injury Arises From Young's Forum Related Activities

When a plaintiff asserts an intentional tort, the defendant's contacts with the forum must be related to the tortious conduct in order for a court to assert specific jurisdiction. *See Advanced Tactical Ordnance Sys., LLC* v. *Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014)

(citing *Walden*, 134 S. Ct. at 1121-22). It is not necessary, however, for the defendant's communications to contain outright misrepresentations. "[L]ulling communications are relevant to the evaluation of the defendant's minimum contacts with the forum state for purposes of establishing personal jurisdiction in a case alleging a fraud." *Felland*, 682 F.3d at 675-76.

In *Felland*, a Wisconsin couple vacationing in Arizona entered into a contract to purchase an unfinished condominium in Mexico. *Id.* at 669. After returning to Wisconsin, the couple asked the developer for assurances that the unit would be finished on schedule. *Id.* The developer sent several communications to the couple in Wisconsin, including emails, letters, and telephone calls, in which he assured them that the project was on schedule and asked them to continue making installment payments on the unit. *Id.* The project was not completed on time and the couple sued in Wisconsin, arguing that the developer's repeated communications were sufficient to allow the court to exercise personal jurisdiction over him. *Id.* at 669-70. The Seventh Circuit agreed, holding that the developer's communications "were part of a deliberate attempt to lull [Felland] to make the installment payments" and were "critical to Felland's claim of intentional misrepresentation." *Id.* at 670.

Similarly, Levin alleges that Young sent numerous communications to him that lulled him into incorrect beliefs about his future with the Library. (Compl. ¶ 68.) Many of these communications were relayed to Levin in Illinois.[5] Levin thus has sufficiently alleged that his injury arose out of Young's continuous fraudulent course of conduct directed at Illinois.

### 3. Traditional Notions of Fair Play and Substantial Justice

Finally, the court must consider whether the exercise of personal jurisdiction over Young would offend traditional notions of fair play and substantial justice. *See N. Grain Mktg.*, 743

---

[5] As discussed above, the court must credit Levin's declaration stating that Young knew he resided in Illinois.

F.3d at 492 (quoting *Int'l Shoe Co.* v. *Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)). The factors considered are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland*, 682 F.3d at 677 (quoting *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 477, 105 S. Ct 2174, 85 L. Ed. 528 (1985)).

Young suggests that it would be burdensome for him to travel to Illinois to defend his case because his salary from the Library is $18,000. But his primary occupation as a professor at the University of Massachusetts suggests that the salary he receives as editor-in-chief is not his only income. (Young Decl. ¶¶ 1, 10.) And while Young may be burdened by having to defend an action in another state, "out-of-state defendants *always* face such a burden." *Felland*, 682 F.3d at 677 (emphasis in original). Moreover, Illinois—like all states—has an interest in providing a forum for its residents to seek redress for torts inflicted by out-of-state actors and injuries suffered within the state. From Levin's perspective, this is the most convenient and effective forum to seek relief. Thus exercising personal jurisdiction over Young does not run afoul of traditional notions of fair play and substantial justice.

## II. Fiduciary Shield Doctrine

Having determined that the court has specific jurisdiction over Young, the court considers whether it should decline to exercise that jurisdiction under the fiduciary shield doctrine. The fiduciary shield "prevents courts from asserting jurisdiction over a person on the basis of acts taken by that person not on his own behalf, but on behalf of his employer." *Rollins* v. *Ellwood*, 565 N.E.2d 1302, 1306, 141 Ill. 2d 244, 152 Ill. Dec. 384 (1990). In adopting the

9

fiduciary shield doctrine, the Illinois Supreme Court "suggested that the element of compulsion involved in an employee's contacts with Illinois made it unfair to assert jurisdiction over him." *Jones* v. *Sable Educ. Sys., Inc.*, 52 F. Supp. 2d 868, 884 (N.D. Ill. 1999) (citing *Rollins*, 565 N.E.2d at 1318). The doctrine is not an absolute right; rather, it is an equitable and discretionary doctrine. *C.S.B. Commodities, Inc.* v. *Urban Trend (HK) Ltd.*, 626 F. Supp. 2d 837, 847 (N.D. Ill. 2009). Courts look to whether the defendant's actions were discretionary and whether personal gain motivated the actions. *See Rice* v. *Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994); *Sommese* v. *Am. Bank & Trust Co. N.A.*, No. 11 C 2827, 2012 WL 3006824, at *3 (N.D. Ill. July 23, 2012).

### A. Discretion

"Courts do not consider it unfair to exercise jurisdiction over an individual when the actions giving rise to personal jurisdiction are discretionary." *Leong* v. *SAP Am., Inc.*, 901 F. Supp. 2d 1058, 1065 (N.D. Ill. 2012) (quoting *Sommese*, 2012 WL 3006824, at *5). But is not enough that an individual "exercise[ ] discretion rather than merely carry[ ] out precise orders mechanically." *Rice*, 38 F.3d at 912. The Seventh Circuit has gone so far as to indicate that the defendant must be "on a frolic of his own" for the shield to be lifted. *Id.* at 912-14.

Young avers that all of his contacts with Levin were in furtherance of his role as editor-in-chief of the Library and at the direction of the Foundation and Posen. (Young Decl. ¶ 6.) Levin insists that the court ignore Young's statement because it is not supported by any facts in the complaint or in Young's motion to dismiss. The burden of proof for this motion rests with Levin, however, so Levin's argument fails absent facts that controvert Young's statement. *See ING (U.S.) Sec., Futures & Options, Inc.* v. *Bingham Inv. Fund, L.L.C.*, 934 F. Supp. 987, 989 (1996) (using uncontroverted facts from defendant's affidavit to apply fiduciary shield); *see also*

10

*Cardona* v. *Kozak*, No. 91 C 967, 1991 WL 152518, at *4 (N.D. Ill. July 26, 1991) (plaintiff has burden of proving jurisdiction exists, including rebutting application of the fiduciary shield).

Levin fails to allege that Young exercised sufficient discretion to lift the fiduciary shield. It is undisputed that Young did not approach Levin to contribute to the Library. Also, Levin's allegations indicate that Posen, not Young, controlled Levin's compensation, and it was Posen's son who controlled the Foundation's outgoing payments. (*See* Compl. ¶¶ 5, 37A, 38A, 56.) Moreover, Levin asserts his fraud claim against all defendants, including Posen and the Foundation, and his allegations often indicate that Young acted at the direction of Posen and reported back to Posen after his meetings with Levin. (*See, e.g., id.* ¶¶ 13, 16, 22, 26B.) In fact, Levin relies on the same communication to argue both that Young himself misrepresented the facts and that he did so as an agent of the Foundation. (*Compare* Compl. ¶ 63E, *with* Levin Decl. ¶ 18A.) *See also Marquette Bank* v. *Brown*, No. 13 C 2620, 2014 WL 1292694, at *5 (N.D. Ill. Mar. 31, 2014) (declining to lift fiduciary shield where allegations in complaint belie allegation that defendant had discretion in his actions). Without any evidence to support the allegations that Young's actions were outside his employment with the Foundation, Levin's argument fails.[6] *See Glass* v. *Kemper Corp.*, 930 F. Supp. 332, 341 (N.D. Ill. 1996) (fiduciary shield protected supervisor where his letters and phone calls to Illinois were "necessary, strictly job-related, and within the scope of [his] employment"); *Maxwell* v. *Vertical Networks, Inc.*, No.

---

[6] Levin argues that Young acted on his own volition by "countermanding . . . the direct order of [Posen]." (Dkt. 22 at 9-10.) In support, Levin points to a voicemail that Young left for Levin in October 2009 instructing Levin to "ignore the faxes and things from [Posen]" and a follow-up phone call from Young to the same effect. (*Id.*) But Levin's own complaint goes on to explain that Young gave Levin this instruction because Posen's faxes were confusing because they were "not in real time." (Compl. ¶ 38A.) Indeed, Young stated in the follow-up voicemail, "Felix has all kinds of stuff going on, but he's on board—he's up to date." (*Id.*) Levin provides no support to show that Young's reasons were untrue or that he was ignoring direction from Posen.

11

03 C 5715, 2005 WL 950634, at \*\*15-16 (N.D. Ill. Mar. 18, 2005) (mere fact that defendant was in position of authority did not mean that he exercised discretion to carry out actions in Illinois).

   B.   **Personal Gain**

"To ascertain whether an individual's personal interests motivated his actions, courts look at a number of factors including the extent to which the individual seeking protection under the [fiduciary shield] doctrine is a shareholder or has a direct financial stake in the corporation's health." *Sommese*, 2012 WL 3006824, at \*3 (citations omitted). Levin never alleges that Young has an ownership interest in the Library or the Foundation. The shield also may be lifted if a defendant's dislike of or malice toward the plaintiff "created or exacerbated the harm to [him]." *Id.* (citing *Rice*, 38 F.3d at 912). Levin never alleges that Young had personal dislike of or malice toward him.

Levin argues instead that the fiduciary shield does not apply because the continued existence of the Library provided Young with an annual salary and Levin's contributions would enhance Young's "personal stature."[7] (Compl. ¶¶ 19-21.) But Illinois courts have applied the fiduciary shield doctrine where an employee acts to keep his job or salary, or even to receive a raise. *See Glass*, 930 F. Supp. at 342 (citing *Rollins*, 565 N.E.2d at 1318); *see also Dick Corp.* v. *SNC-Lavalin Constructors, Inc.*, No. 04 C 1043, 2006 WL 1049724, at \*5 n.10 (N.D. Ill. Apr. 20, 2006) ("[D]efendants' interest in remuneration and job security is not the type of personal stake that warrants denial of the fiduciary shield.") (citation omitted). Personal prestige is

---

[7] Levin argues that if the shield protects Young, Levin might not be able to obtain relief from the Foundation since it is funded only by Posen, who could merely cease his monetary contributions. (Dkt. 22 at 11.) However, the Foundation's insolvency would only be an exception to the exercise of the fiduciary shield if (1) Young had a role making the Foundation insolvent for this purpose or (2) if the Foundation was merely an alter-ego of Young. *See Dehmlow* v. *Austin Fireworks, Inc.*, No. 90 C 4666, 1996 WL 41494, at \*\*2-3 (N.D. Ill. Feb. 1, 1996). Levin does not make either of these claims or allege any facts to support them.

another byproduct of employment. Even if Young had a particular interest in the incorporation of a musical component into the Library, Levin fails to provide any facts about how such an incorporation would serve Young's personal benefit to a greater degree than other benefits of employment.[8]

Levin has failed to provide any reason to lift the protection of the fiduciary shield from Young.

## CONCLUSION

For the foregoing reasons, the court declines to assert jurisdiction over defendant Young. Young's motion to dismiss (dkt. 16) is granted and the claims against him are dismissed without prejudice.

Date: July 29, 2014

---

[8] The court also notes the contradictory nature of Levin's allegations. On one hand, he insists that Young kept his work out of the Library. On the other hand, he argues that Young would have derived personal gain from including Levin's work in the Library.