# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NEIL W. LEVIN,           )
                            )
        Plaintiff,       )         Case No. 13 C 8102
                            )
        v.             )         Judge Joan H. Lefkow
                            )
THE POSEN FOUNDATION and FELIX   )
POSEN                    )
                            )
        Defendants.    )

## OPINION AND ORDER

Plaintiff Neil W. Levin filed suit alleging breach of implied contract and copyright infringement against The Posen Foundation and common law fraud against The Posen Foundation, Felix Posen, and James E. Young. The court dismissed the suit against Young for lack of personal jurisdiction. (Dkt. 41.)

The remaining defendants, the Posen Foundation and Felix Posen, now ask the court to dismiss the suit against Felix Posen for lack of personal jurisdiction. They also ask the court to dismiss the implied contract claim and the fraud claim for failure to state a claim upon which relief can be granted. For the reasons discussed below, defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

Plaintiff Neil W. Levin is a scholar of Jewish music. (Dkt. 1 ("Compl.") ¶ 4B.) He teaches at Jewish Theological Seminary of America and serves as artistic director and editor-in-

---

[1] Unless otherwise indicated, the following facts are taken from the complaint and are presumed true for the purpose of resolving the pending motion. *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002).

chief of The Milken Archive of Jewish Music. (*Id.* ¶¶ 4B, 4C.) Levin is a resident of Illinois. (*Id.* ¶ 4.)

Felix Posen is the founder and president of The Posen Foundation ("the Foundation"), a Swiss equivalent of a not-for-profit corporation. (*Id.* ¶ 5.) The Foundation has "assets and operations" in the United States, Israel, Switzerland, and England—where Posen lives. (*Id.*) One of the Foundation's projects is The Posen Library of Jewish Culture and Civilization ("the Library"), a ten-volume series that, as the defendants describe it, "anthologizes Jewish artistic, literary, intellectual and spiritual works from biblical times to the present." (Dkt. 37 at 3.) In his complaint, Levin notes the Library includes "recorded music." (Compl. ¶ 5D.) The Library's editor-in-chief is James E. Young and its executive editor is Joyce Rappaport. (*Id.*) The Library's first volume, Volume X, was published by Yale University Press in November 2012. (*Id.*)

Rappaport first reached out to Levin on October 27, 2008, when she sought his advice on the Library's inclusion of recorded music. (*Id.* ¶ 6A.) Rappaport also told him that the Foundation was interested in establishing a partnership with The Milken Archive. (*Id.* ¶ 6B.) This initial communication sparked a series of emails, phone calls, and meetings between Levin and Foundation employees that eventually led to Levin's working as the Foundation's "musical expert." (*See id.* ¶¶ 6E, 7.)

Levin's role quickly expanded. At a November 25, 2008 meeting in London, Posen asked Levin to determine whether an "additional volume devoted exclusively to Jewish music" would be feasible. (*Id.* ¶ 8C.) If it would be, Posen suggested Levin edit it. (*Id.*) Posen also asked Levin to look whether the Library should include additional writings, ranging from scholarly articles to bibliographies, on Jewish music. (*Id.* ¶ 8B.) Levin's role further expanded

when, in a February 15, 2009 email, Young invited Levin to join the Library's Editorial Advisory Board of Experts to vet other scholars' musical selections. (*Id.* ¶ 15 (internal quotation marks omitted).) Young also offered Levin a "$3,000 'honorarium'" for joining the board. (*Id.*)[2]

Three months later, at a May 21, 2009 meeting, Levin told Young and Rappaport that he had determined an additional volume dedicated exclusively to music would be feasible. (*See id.* ¶¶ 18A–B.) Young agreed and told Levin the Library would publish the additional volume. (*See id.*) Young also asked Levin to be the Library's music editor. (*Id.* ¶ 18A.) Levin accepted Young's offer on three conditions, which Levin claims Young consented to: that Levin's role apply to the entire Library, that he have sole authority over all music-related content, and that his official title be music editor of the Posen Library of Jewish Culture and Civilization. (*Id.*) Young also offered Levin compensation "consistent with his contribution to the project." (*Id.* ¶ 18C.)

A few days later, Young emailed Levin and Posen a summary of the May 21, 2009 meeting:

> We hammered out both a consulting and a collaboration agreement with [Levin] that will address both immediate (*i.e.*, Vol. X) and long-term issues surrounding the integration of music into The Posen Library. We all agree strongly that the music component of the Library is crucial to its success and stature, and that we need to do it right, or not at all.

(*Id.* ¶ 22 (emphasis removed).) Young's email goes on to discuss possible problems with the Library's page limits:

> Joyce points out that the addition of these entries may well put Volume X over its page limit. Once we've received the list and actual manuscript pages from [Levin], we will work together with

---

[2] According to Levin, the Library never paid the honorarium. (Compl. ¶ 15C.)

<blockquote>
Volume Editors Deborah Moore and Nurith Hirsch, either to subtract other entries or to divide Volume X into two books . . . .
</blockquote>

(*Id.* ¶ 23 (emphasis removed).)  A few days after Young sent the email, Levin called Young to ask him why the email did not mention Levin's new title of music editor.  (*Id.* ¶ 24.)  Young assured Levin it was a mistake.  (*Id.*)  On May 27, 2009, Levin emailed Posen summarizing the meeting in his own words.  (*Id.* ¶ 25.)  Posen responded:  "Yes.  I too heard that there was a good and fruitful meeting between all of you."  (*Id.*)  At a June 7, 2009 meeting at Posen's home in London, Posen also accepted Levin's "pre-conditions" for assuming the position of music editor, including the condition that he have sole authority over all music-related elements of the Library.  (*Id.* ¶ 26B.)

In late August of 2009, Posen phoned Levin at his Illinois office regarding his progress on Volume X.  (*Id.* ¶ 30.)  Posen "expressed concern" that Levin had not yet submitted any work.  (*Id.*)  Levin told Posen that the work was in progress.  (*Id.*)  Levin then asked Posen to personally guarantee his title of music editor.  (*Id.* ¶30A.)  Even though Posen had accepted Levin's "pre-conditions" two months earlier, Levin was concerned that his title was not official; on more than one occasion, Young had either misstated or forgotten it.  (*Id.*; *see also id.* ¶¶ 26B, 28.)  Posen told Levin that he would personally guarantee Levin's title if Levin would send him descriptions of his work that justified the title.  (*Id.* ¶ 30B.)  Levin refused and told Posen that he would "resign" and send an "invoice for his time expended."  (*Id.*)  When Posen did not waver, Levin agreed to provide written descriptions of his work.  (*Id.* ¶¶ 30B–C.)

On September 25, 2009, Levin faxed Posen a letter providing a "'more concrete' idea of what [he] would include in the Posen Library."  (*Id.* ¶ 31.)  Posen emailed Levin the following day, stating that he now had a better understanding of what Levin had in mind.  (*Id.* ¶ 32.)  Posen did not, however, personally guarantee Levin the title of music editor.  Instead, he wrote:

"Assuming you can finish at least what we need for Volume X . . . by the end of November, everything else is ready, then we would be happy to offer you the position of Musical Editor." (*Id.* (emphasis removed).)

On October 6, 2009, Levin sent Posen more "sample material." (*Id.* ¶ 33.) On October 20, 2009, Posen emailed Levin and asked him to "finish as fast as you can what you think should go into Volume 10." (*Id.* ¶ 35.) Later that month, Posen emailed Levin again regarding licensing and permission rights for the different volumes. (*Id.* ¶ 40.) Posen also suggested the Foundation pay Levin $25,000 per volume for his contributions to the Library. (*Id.* ¶ 37A.) In November or December of 2009, Young asked Levin to produce bibliographies of literature on Jewish music. (*Id.* ¶ 41.) Around that same time, the deadline for Volume X was postponed. (*Id.*)

Over the next year, Levin sent Rappaport nine scholarly articles (one of which Levin authored), two bibliographies on writings, and four bibliographies on music. (*Id.* ¶ 42.) When Rappaport received the materials, she informed Levin that he would need to shorten the articles to less than 1,500 words as well as create annotated lists for the music bibliographies. (*Id.* ¶ 44.) Levin told Rappaport that "this was not the way in which he had been working on the Bibliographies" and "that it was the first time it had been suggested to him by anyone." (Compl. ¶ 45A.) He did offer to "re-examine" the writings, however, if Rappaport would identify which ones needed to be shortened. (*Id.* ¶ 44B.) It appears from Levin's complaint that at some point after this exchange, Levin asked Young for Volume X's specific page limits. (*See id.* ¶ 46.) On March 16, 2010, Young responded that as soon as the Foundation had a complete draft, he would know the volume's page limits. (*Id.*)

Levin sent another installment of his work product on April 14, 2010. (*Id.* ¶ 47.) Levin included a note along with the installment that asked whether he was "on the right track." (*Id.*) On May 19, 2010, Young told Levin that his work was "exactly what [the Foundation] was hoping for." (*Id.* ¶ 47A.) Young urged Levin to continue working but also warned him that the Foundation might need to cut 20% of Levin's submissions. (*Id.*) Levin sent another installment of his work on June 6, 2010. (*Id.* ¶ 48.) On September 8, 2010, Levin emailed Rappaport the "complete Posen Volume X Document." (*Id.* ¶ 50 (internal quotation marks omitted).) It had 945 entries and was 47 pages long. (*Id.*) On September 14, 2010, Levin faxed Rappaport an additional article accompanied by a note inquiring about "next step[s]." (*Id.* ¶ 51.) Rappaport told Levin that Young would call him. (*Id.* ¶ 51B.) A little over a month later, on October 15, 2010, Young emailed Levin asking him to limit his submission of 945 entries to 40 entries. (*Id.* ¶ 52.) Young also stated that the Foundation wanted to "continue working" with Levin and that a "standalone volume" edited by Levin "would make an amazing part of the Posen Library." (*Id.* ¶ 53B.) Young told Levin that the Foundation was "glad" to list him as the "Musical Editor." (*Id.* ¶ 53B.)

The next day, Posen emailed Levin about the cuts:

> Final word must remain with the editor-in-chief [Young] and the volume editors . . .
> \*\*\*
> Everyone knows that your knowledge in the field is supreme which does not mean that certain inputs from the volume editors etc. cannot also be included and may from time to time have to overrule the recommendation of numero uno in a specialized field.

(*Id.* ¶ 54 (emphasis removed).)

On October 22, 2010, Young sent an email to Levin, Posen, and Rappaport:

> I finally had a long talk with [Levin] after submitting my last request to him for his choice of 40 entries of musical

> compositions . . . which Deborah had agreed to include, integrated
> into her own list . . . [Levin] is simply unwilling and avowedly
> unable to reduce his list of 900 entries to 40 . . .

(*Id.* ¶ 55.)  Young's email further stated that, although Levin did not want his name on Volume X in any capacity, he was willing to let the Foundation use "everything" he had given them, including his list of 945 entries, as long as he was paid.  (*Id.* ¶ 56.)  Young's email also suggested that while a volume devoted solely to music was a still a possibility, it was not set in stone—contrary to his earlier statement that the Library would include a volume devoted solely to music.  (*Compare id.* ¶ 56 *with id.* ¶ 18.)

In a February 6, 2011 email, Young informed Levin that the Foundation would remove his name from the editorial and administrative mastheads.  (*Id.* ¶ 59.)  Young stated: "We appreciate being able to use the work you have already done, for which you will be paid."  (*Id.*)  Young also expressed a desire to reprint an extract of one of the scholarly essays written by Levin.  (*Id.*)  The next day, Posen replied to Young's email (with a copy sent to Levin) stating that if Levin did not give the Foundation permission to use his work, "[i]t must then be clear we do NOT pay."  (*Id.* ¶ 60.)

According to Levin, five of the abridged articles Levin submitted were printed in the published Volume X, including Levin's own article.  (*Id.* ¶ 53A.)  Levin also alleges that Volume X included an "unauthorized" biography of him.  (*Id.* ¶ 59A.)  He claims the Foundation has not paid him.  (*Id.* ¶ 59B.)

## ANALYSIS

### I.     Personal Jurisdiction

Rule 12(b)(2) permits dismissal of a claim based on lack of personal jurisdiction over the defendant.  *See* Fed. R. Civ. P. 12(b)(2).  The party asserting personal jurisdiction—here, the

plaintiff—bears the burden of proof. *See Purdue Research Found.* v. *Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When the court rules on the motion without a hearing, the plaintiff need only establish a "*prima facie* case of personal jurisdiction." *Id.* (quoting *Hyatt Int'l Corp.* v. *Coco*, 302 F.3d 707, 713 (7th Cir. 2002)) (internal quotation marks omitted). The court will "read the complaint liberally, in its entirety, and with every inference drawn in favor of" the plaintiff. *Cent. States, Se. & Sw. Areas Pension Fund* v. *Phencorp Reins. Co.*, 440 F.3d 870, 878 (7th Cir. 2006) (quoting *Textor* v. *Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1393 (7th Cir. 1993)) (internal quotation marks omitted). Disputes concerning relevant facts are resolved in favor of the plaintiff. *Purdue*, 338 F.3d at 782.

The court, sitting in diversity, has personal jurisdiction over Posen to the extent that an Illinois court could exercise such jurisdiction. *See Philos Techs., Inc.* v. *Philos & D, Inc.*, 645 F.3d 851, 855 n.2 (7th Cir. 2011). Illinois allows for personal jurisdiction to the extent authorized by the Fourteenth Amendment's due process clause, which merges the federal constitutional and state statutory inquiries. *See N. Grain Mktg., LLC* v. *Greving*, 743 F.3d 487, 491 (7th Cir. 2014); *Tamburo* v. *Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); *see also* 735 Ill. Comp. Stat. 5/2-209(c). Under the Illinois long-arm statute, personal jurisdiction may be general or specific. *uBid, Inc.* v. *GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010).

### A.    General Jurisdiction

General jurisdiction is a demanding standard requiring "'continuous and systematic general business contacts' with the forum state." *Id.* at 425–26 (quoting *Helicopteros Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408, 415–16, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)). These contacts must be "sufficiently extensive and pervasive to approximate physical

presence." *Helicopteros*, 466 U.S. at 15–16. The facts in this case do not support a finding of general jurisdiction over Posen.

### B.     Specific Jurisdiction

Specific jurisdiction grows out of "the relationship among the defendant, the forum, and the litigation." *Walden* v. *Fiore*, --- U.S. ---, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2013) (quoting *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)) (internal quotation marks omitted). This type of jurisdiction requires that, "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *N. Grain Mktg.*, 743 F.3d at 492 (quoting *Tamburo*, 601 F.3d at 702) (internal quotation marks omitted). "The exercise of specific jurisdiction must also comport with the traditional notions of fair play and substantial justice." *Id.* (citing *Tamburo*, 601 F.3d at 702).

### 1.     Whether Posen's Activities Were Purposefully Directed At Illinois

The question of whether a defendant purposefully directed activities at a forum "depends in large part on the type of claim at issue." *Felland* v. *Clifton*, 682 F.3d 665, 674 (7th Cir. 2012). Levin alleges Posen committed fraud—an intentional tort. *See, e.g.*, *Trading Techs., Int'l, Inc.* v. *CQG, Inc.*, No. 05 C 4811, 2014 WL 1977029, at *4 n.3 (N.D. Ill. May 9, 2014). Thus, the court must determine whether Posen engaged in intentional and allegedly tortious conduct expressly aimed at the forum state and whether Posen engaged in that conduct with the knowledge that it would injure the plaintiff in the forum state. *Tamburo*, 601 F.3d at 703 (citing *Calder* v. *Jones*, 465 U.S. 783, 789, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)). "The defendant's conduct and

connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there." *N. Grain Mktg.*, 743 F.3d at 492.

In his response to defendants' motion to dismiss, Levin lists the "communications into Illinois" that he claims were "instrumentalities" of the fraud perpetrated against him.[3] (Dkt. 47 at 4–5.) These include six different instances in which Posen reached out to Levin: two phone calls and four emails.[4] (*Id.* at 5.) During the first phone call, which took place in late August 2009, Posen told Levin he would "personally guarantee" Levin the title of "Music Editor" if Levin sent him "written descriptions of the work he was and would be doing . . . ." (Compl. ¶ 30B.) Levin agreed to provide these descriptions. (*Id.* ¶¶ 30B–C.) A month later, Posen sent Levin an email, which stated: "Assuming you can finish at least what we need for Volume X . . . by end of November, everything else is ready, then we would be happy to offer you the position of Musical Editor." (*Id.* ¶ 32 (emphasis removed).) In this same email, Levin alleges Posen offered him a flat fee of $12,000 for his work on Volume X. (*Id.* ¶ 32A.) Levin then sent Posen two more installments of the sample material he requested. (*Id.* ¶ 33.) In response, Posen sent Levin another email in which he wrote "Thanks so much for keeping your promise to get

---

[3] Levin includes ten emails and five phone calls from Young, which he argues can be attributed to Posen through the doctrine of *respondeat superior*. Under *respondeat superior*, "an employer can be liable for the torts of his employee when those torts are committed within the scope of the employment'" *Adames* v. *Sheahan*, 909 N.E.2d 742, 754, 233 Ill. 2d 276, 330 Ill. Dec. 720 (2009) (internal quotation marks omitted). In order to attribute Young's communications to Posen, Levin would have to show either that Posen was Young's employer for the purposes of agency law or that the doctrine of *respondeat superior* allows the communications of an inferior employee to be attributed to a superior employee. Levin has failed to provide any support for either argument. A mere allegation of attribution does not rise to the level of a *prima facie* showing of jurisdictional facts. Thus, the court considers Posen's communications only.

[4] Defendants argue that Levin identifies only two allegedly fraudulent statements by Posen— "Yes, I too heard that there was a good and fruitful meeting between all of you" and "everything else is ready." (Dkt. 47 at 2.) This ignores the statements in the first sixty-one paragraphs of Levin's complaint, which Levin incorporates into his fraud claim. (*See* Compl. at 53.)

going quickly so we can get an idea of what you have in mind . . . .  All of us are duly impressed."  (*Id.* ¶ 34.)

On October 10, 2009, Posen sent Levin another email, in which Posen directed Levin to "finish as fast as you can what you think should go into Volume 10" as well as "Volume 9 and other volumes."  (*Id.* ¶ 35 (emphasis removed).)  On October 29, 2009, Posen emailed Levin again regarding licensing and permission rights for the different volumes.  (*Id.* ¶ 40.)  Around October 31, 2009, Levin and Posen spoke on the phone for the second time.  (*Id.* ¶ 37.)  During this conversation, Levin claims Posen suggested Levin receive $25,000 per volume for his work on each of the Library's ten volumes.  (*Id.* ¶ 37B.)  These communications form the basis of Levin's assertion of personal jurisdiction over Posen.

The court must now determine whether, through these communications, Posen engaged in intentional and allegedly tortious conduct expressly aimed at the forum state and whether Posen engaged in that conduct with the knowledge that it would injure Levin in Illinois.  *See Tamburo*, 601 F.3d at 703 (citing *Calder*, 465 U.S. at 789).  Posen's communications were intentional.  Reading the complaint "liberally, in its entirety, and with every inference drawn in favor of" Levin, *Cent. States, Se. & Sw. Areas Pension Fund*, 440 F.3d at 878 (quoting *Textor*, 711 F.2d at 1393) (internal quotation marks omitted), Posen's communications can also be characterized as allegedly tortious.  Levin claims that Posen and the Foundation lulled him into a false sense of security by concealing the Library's page limitations while encouraging him to keep working.  (Compl. ¶ 58.)  Then they "pulled the rug out from under him and paid him nothing."  (Dkt. 46 at 1.)  Posen's communications either explicitly ask Levin to keep working (e.g., "finish as fast as you can"), provide incentives for Levin to keep working (e.g., promising to personally guarantee the music editor title, offering Levin $12,000 and then $25,000), or

express approval of Levin's work (e.g., "[a]ll of us are duly impressed").  Even Posen's October 29, 2009 email regarding licensing and permission rights for the Library's different volumes could be construed as fraudulently giving Levin the impression that everything was on track. Although Posen's comment that "everything else is ready" is vague, his other communications are intentional and  can be viewed as tortious acts.

Although defendants argue there is no allegation that Levin was in Illinois when Posen's emails were transmitted (dkt. 37 at 8), the Seventh Circuit has held that phone calls and emails may be properly considered in minimum contacts analyses, especially if they were purposefully sent to a forum resident knowing that they would "most likely" be read in the forum.  *Felland*, 682 F.3d at 676 n.3; *see also Triad Capital Mgmt., LLC* v. *Private Equity Capital Corp.*, No. 07 C 3641, 2008 WL 4104357, at *5 (N.D. Ill. Aug. 25, 2008) ("[E]ven when contact takes place only via telephone or email, it can create a substantial connection between the defendant and the forum state . . . .").  Levin has sufficiently alleged that Posen knew Levin was a resident of Illinois and thus Posen knew they would most likely be read in Illinois.  (Dkt. 47 at 7.)  Posen's communications, therefore, are sufficient to constitute activities purposefully directed at Illinois.

### 2.    Whether Injury Arises from Posen's Forum Related Activities

When a plaintiff asserts an intentional tort, the defendant's contacts with the forum must be related to the tortious conduct in order for a court to assert specific jurisdiction.  *See Advanced Tactical Ordnance Sys., LLC* v. *Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014) (citing *Walden*, 134 S. Ct. at 1121–22).  It is not necessary, however, for the defendant's communications to contain outright misrepresentations.  "[L]ulling communications are relevant to the evaluation of the defendant's minimum contacts with the forum state for purposes of establishing personal jurisdiction in a case alleging a fraud."  *Felland*, 682 F.3d at 675–76

(upholding a finding of jurisdiction where a developer's repeated communications "were part of a deliberate attempt to lull [plaintiffs] to make the installment payments" and were "critical to [plaintiffs'] claim of intentional misrepresentation").

Levin alleges that Posen sent numerous communications to him that lulled him into a false sense of security over his future with the Library. Many of these communications were relayed to Levin in Illinois. Thus, Levin has sufficiently alleged that his injury arose out of Posen's continuous fraudulent course of conduct directed at Illinois.

### 3.     Traditional Notions of Fair Play and Substantial Justice

Finally, the court must consider whether the exercise of personal jurisdiction over Posen would offend "traditional notions of fair play and substantial justice." *See N. Grain Mktg.*, 743 F.3d at 492 (quoting *Int'l Shoe Co.* v. *Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)) (internal quotation marks omitted). Several factors are to be considered: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland*, 682 F.3d at 677 (quoting *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 477, 105 S. Ct 2174, 85 L. Ed. 528 (1985)) (internal quotation marks omitted).

Posen does not explain how he would be burdened by an exercise of jurisdiction other than to note that he lives in England. (*See* Dkt. 37 at 2.) While international travel can be burdensome, it is not sufficient to deny jurisdiction. The other interests at play counsel in favor of an exercise of jurisdiction. Illinois—like all states—has an interest in providing a forum for its residents to seek redress for torts inflicted by out-of-state actors. Levin has an interest in

obtaining convenient and effective relief. From the state's perspective and from Levin's perspective, these interests are best achieved through the exercise of jurisdiction of an Illinois court.

### C. Fiduciary Shield Doctrine

Posen argues that even if this court finds that he has sufficient contacts with the state of Illinois to support a finding of jurisdiction, the court should decline to exercise that jurisdiction under the fiduciary shield doctrine. (*Id.* at 9.) The fiduciary shield doctrine "prevents courts from asserting jurisdiction over a person on the basis of acts taken by that person not on his own behalf, but on behalf of his employer." *Rollins* v. *Ellwood*, 565 N.E.2d 1302, 1306, 141 Ill. 2d 244, 152 Ill. Dec. 384 (1990). The fiduciary shield is not an absolute right; rather, it is an equitable doctrine. *C.S.B. Commodities, Inc.* v. *Urban Trend (HK) Ltd.*, 626 F. Supp. 2d 837, 847 (N.D. Ill. 2009). In determining whether to apply the fiduciary shield to a defendant, courts look to whether the defendant's actions were discretionary and whether they were motivated by personal gain. *See Rice* v. *Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994); *Sommese* v. *Am. Bank & Trust Co. N.A.*, No. 11 C 2827, 2012 WL 3006824, at *3 (N.D. Ill. July 23, 2012).

Posen argues that he should not have to defend Levin's suit in this court because he was acting on the Foundation's behalf. (Dkt. 37 at 9.) The fiduciary shield doctrine, however, does not protect every employee acting on his employer's behalf—it protects employees who are acting at the direction of another. As the Illinois Supreme Court explained, the doctrine exists to ensure that employees are not haled into court where there is an "element of compulsion" in the "employee's contacts with Illinois" that makes it "unfair to assert jurisdiction over him." *Jones* v. *Sable Educ. Sys., Inc.*, 52 F. Supp. 2d 868, 884 (N.D. Ill. 1999) (citing *Rollins*, 565 N.E.2d at

1318).  Posen, the founder and president of the Foundation, does not argue that he was acting

under the direction of another.

Posen also argues that the fiduciary shield should apply because he was acting

"philanthropically."  (Dkt. 37 at 2, 9.)  The Foundation's status as a Swiss equivalent of a not-

for-profit corporation does not absolve Posen of responsibility for his actions.  Posen chose to

conduct business with individuals outside of his jurisdiction.  For these reasons, the court

declines to extend the fiduciary shield doctrine.  The court has personal jurisdiction over Posen.

## II.    Failure to State a Claim

The defendants have also filed a 12(b)(6) motion asking the court to dismiss the implied

contract claim against the Posen Foundation and the fraud claim against the Posen Foundation

and Felix Posen.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a

complaint for failure to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).

In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the

plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.

*Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002).  To survive a Rule 12(b)(6) motion, the

complaint must not only provide the defendant with fair notice of a claim's basis but must also

establish that the requested relief is plausible on its face.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662,

678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S.

Ct. 1955, 167 L. Ed. 2d 929 (2007).  The allegations in the complaint must be "enough to raise a

right of relief above the speculative level." *Twombly*, 550 U.S. at 555.  At the same time, the

plaintiff need not plead legal theories. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th

Cir. 2010).  "Federal pleading rules call for 'a short and plain statement of the claim showing the

pleader is entitled to relief' . . . . [T]hey do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson* v. *City of Shelby*, 574 U.S. ---, --- S. Ct. ----, 2014 WL 5798626, at *1 (Nov. 10, 2014) (per curiam) (citation omitted).

### A.    Implied Contract

Levin alleges there was an implied contract between himself and the Foundation. Levin's requested relief is compensation for this work, or *quantum meruit*. *Quantum meruit* means "as much as he deserves," and is based on the implied promise of a recipient of services to pay for the value of those services. *Carlton at the Lake, Inc.* v. *Barber*, 928 N.E.2d 1266, 1272, 401 Ill. App. 3d 528  (2010) (quoting *First Nat'l Bank of Springfield* v. *Malpractice Research, Inc.*, 688 N.E.2d 1179, 1185, 179 Ill. 2d 353, 228 Ill. Dec. 202 (1997)) (internal quotation marks omitted). "A party seeking recovery on a *quantum meruit* theory must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's retention of the benefit in the absence of any compensation." *Id.*  At this stage in the litigation, however, Levin does not need to plead every element required of a *quantum meruit* claim; he need only show that requested relief is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

Levin's complaint details the nature of his work for the Foundation, as well as when and how it was submitted. As Levin notes, he faxed Posen a letter with an "idea of what [he] would include in The Posen Library." (Compl. ¶ 31 (emphasis removed).) Levin followed up with samples of different entries. (*Id.* ¶ 31A.) Levin later sent Rappaport ten scholarly articles (one of which Levin wrote), two bibliographies on writings, and four bibliographies on music. (*Id.* ¶¶ 42, 51.) Levin alleges that the Foundation used five of the articles he submitted, including the

one he wrote.  (*Id.* ¶ 53A.)  He further alleges that the Foundation never paid him for his work.

(*Id.* ¶ 59B.)  These allegations are "enough to raise a right to relief above the speculative level."

*See Twombly*, 550 U.S. at 555.  Defendants argue that because Levin does not allege the

Foundation used his bibliographies, "any claim for quantum meruit based on the bibliographies

should be dismissed."  (Dkt. 37 at 15.)  Pleading every relevant fact is unnecessary.  Levin has

only one claim for *quantum meruit* and it is supported by his allegations that the Foundation used

five of the abridged articles he submitted.

In support of their motion to dismiss, defendants cite to "similar" cases where courts

denied *quantum meruit* claims.  (*Id.* at 14–15.)  In all of these cases, however, the courts

determined that the defendant received no benefit from the plaintiff's services.  *See Production*

*Process Consultants, Inc.* v. *Wm. R. Hubbell Steel Corp.*, 988 F.2d 794, 796 (7th Cir. 1993);

*Shore* v. *Motorola, Inc.*, No. 94 C 5890, 1997 U.S. Dist. LEXIS 1559, at *70–71 (N.D. Ill Feb. 5,

1997); *Veninga* v. *Fmali Herb Co.*, No. 97 C 1683, 1997 U.S. Dist. LEXIS 14524, at *13–14

(N.D. Ill. Sept. 17, 1997).  Here, Levin has adequately alleged that the Foundation benefited

from Levin's services by using five of the articles he submitted.

Defendants' final argument is that Levin's *quantum meruit* claim is preempted by his

copyright claim.  The Copyright Act preempts a state law claim if (1) the work in which the right

is asserted is fixed in tangible form and comes within the subject matter of copyrightable works

as specified in §§ 102 and 103 and (2) the right is equivalent to any of the rights protected by the

Copyright Act as specified in § 106.  17 U.S.C. § 301(a); *Seng-Tiong Ho* v. *Taflove*, 648 F.3d

489, 500 (7th Cir. 2011) (citing *Baltimore Orioles, Inc.* v. *Major League Baseball Players Ass'n*,

805 F.2d 663, 674 (7th Cir. 1986)).

Levin's *quantum meruit* claim is based on the "scholarly services" he rendered to the Foundation. (Compl. ¶ 62.) The only benefit he alleges the Foundation received, however, is the publication of five of the articles Levin submitted. (*Id.* ¶ 53A.) Unlike the more amorphous "scholarly services," these articles are tangible in form and come within the subject matter of copyrightable works as specified in §§ 102 and 103, which provide protection for compilations of literary works. 17 U.S.C. §§ 102(a)(1), 103(a). The sufficiently pleaded part of Levin's *quantum meruit* claim, therefore, satisfies the first requirement for preemption.

Section 106 of the Copyright Act protects an owner's exclusive rights to reproduce, distribute, and sell the copyrighted work. *Id.* § 106(1–3). Thus, Levin's *quantum meruit* claim for the Foundation's use of the five abridged articles he submitted is the equivalent of his copyright claim under § 106 for the Foundation's use of the five abridged articles he submitted. Because both requirements are met, Levin's *quantum meruit* claim is preempted by the Copyright Act. *See, e.g.*, *McNabb Bennett & Assocs., Inc.* v. *Terp Meyers Architects*, No. 85 C 8792, 1986 U.S. Dist. LEXIS 24322, at **10–11 (N.D. Ill. June 11, 1986 (finding plaintiffs' *quantum meruit* claim preempted by the Copyright Act where plaintiffs had not alleged any use of their architectural drawings "beyond the uses covered by copyright laws"). Because Levin bases his *quantum meruit* claim on his rendering of "scholarly services," however, the court grants Levin leave to amend his complaint to address how the Foundation benefited from his rending of "scholarly services" if at all.

### B.    Fraud

Defendants also move to dismiss Levin's claim for fraud. Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b)'s heightened pleading threshold, the pleader must detail "the identity

of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Hefferman* v. *Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Bankers Trust Co.* v. *Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)). Stated differently, the complaint must include the "who, what, when, and where of the alleged fraud." *Uni*Quality, Inc.* v. *Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (internal quotation marks omitted). In contrast, "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed. R. Civ. P. 9(b); *Hefferman*, 467 F.3d at 601. The plaintiff need not plead facts showing that the representation is indeed false. *Hefferman*, 467 F.3d at 601.

Levin's complaint meets this standard. Levin claims that Foundation employees encouraged him to keep working while concealing how little space was available for his submissions. For example, in May 2009, Young sent Levin an email promising Levin a consulting fee and stating that, should Volume X be too long, Young would work with the volume editors "to subtract other entries or to divide Volume X into two books . . . ." (Compl. ¶ 23.) Thus, Young encouraged Levin to keep working without warning him of the impending cuts. Young sent Levin another email in response to Levin's question as to whether he was "on the right track" in which Young wrote that Levin's work was "exactly what we were hoping for" and in which Young asked Levin to "continue in this vein." (*Id.* ¶ 47A.)

Levin alleges that Posen made similar misrepresentations, lulling Levin into a false sense of security regarding his future with the Foundation. During Levin's first phone call with Posen, which took place in August 2009, Posen told Levin that he would "personally guarantee" the title of "Music Editor" if Levin would send him "written descriptions of the work he was and would be doing . . . ." (*Id.* ¶ 30B.) Levin sent the descriptions a month later. (*Id.* ¶ 31.) A few days

after that, Posen sent Levin an email telling Levin that if he could finish his work on Volume X, "everything else is ready." (*Id.* ¶ 32 (emphasis removed).) In that same email, Posen offered Levin a flat fee of $12,000 for his work on Volume X. (*Id.* ¶ 32.)

In October 2009, after Levin sent Posen two more installments of sample material, Posen sent Levin another email in which he wrote "Thanks so much for keeping your promise to get going quickly so we can get an idea of what you have in mind . . . . All of us are duly impressed." (*Id.* ¶¶ 33–34.) A few days later, Posen sent Levin another email, in which Posen directed Levin to "finish as fast as you can what you think should go into Volume 10" as well as "Volume 9 and other volumes." (*Id.* ¶ 35 (emphasis removed).) Later that month, Posen emailed Levin about licensing and permission rights for the different volumes. (*Id.* ¶ 40.) At the end of the October, Levin and Posen spoke on the phone for the second time. (*Id.* ¶ 37.) During this conversation, Levin claims Posen suggested the Foundation compensate Levin $25,000 per volume. (*Id.* ¶ 37A.)

Each these communications explicitly asks Levin to keep working, provides incentives for him to keep working, or expresses approval of his work. Thus, Levin has stated the facts necessary to support his claim that the Foundation and Posen concealed Volume X's page limits so that Levin would continue working. *See Uni\*Quality, Inc.*, 974 F.2d at 923; he has alleged the "who, what, when, and where of the alleged fraud." *Id.* (internal quotation marks omitted). Because Levin has met Rule 9(b)'s pleading standards, defendants' motion to dismiss Levin's claim for fraud against the Foundation and Posen is denied.

**CONCLUSION**

For these reasons, defendants' motion to dismiss is granted in part and denied in part.

Levin is granted leave to file an amended complaint with respect to Count I by January 20, 2015.

Date: January 6, 2015