**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEIL W. LEVIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:13-cv-08102 |
| | ) | |
| THE POSEN FOUNDATION, a Swiss | ) | Judge Joan H. Lefkow |
| Foundation (all Counts), and FELIX POSEN, | ) | |
| an individual (Count III), | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED OPINION AND ORDER

Neil W. Levin, a distinguished scholar of Jewish music, sued Felix Posen and the Posen

Foundation, a family foundation of which Felix Posen is president, asserting several claims

arising from an aborted collaboration with the Posen Foundation on the creation of an anthology

of Jewish music for the POSEN LIBRARY OF JEWISH CULTURE AND CIVILIZATION (the POSEN

LIBRARY). After more than five years of litigation, during which some claims and one defendant

were dismissed and fruitless settlement attempts were made, the case is before the court on

defendants' motion for summary judgment on Levin's surviving claims for fraud and breach of

implied contract against Posen and the Posen Foundation.[1]

For the reasons stated in this Opinion, the motion is denied with respect to the implied

contract claim and granted with respect to the fraud claim.

---

[1] The court's jurisdiction arises from diversity of citizenship, 28 U.S.C. § 1332, in that plaintiff is a citizen of Illinois and all defendants are citizens of another state or foreign country. The amount in controversy exceeds $75,000. Venue is proper under 18 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred within the Northern District of Illinois. (Defendants have denied that venue is proper (dkt. 64 ¶ 3) but have proceeded to litigate in this court. Thus any objection is waived. *See Wachovia Bank* v. *Schmidt*, 546 U.S. 303, 305, 126 S. Ct. 941, 944 (2006) ("Venue, largely a matter of litigational convenience, is waived if not timely raised.") Levin's copyright claim was voluntarily withdrawn (dkt. 130), and James E. Young (editor-in-chief of the POSEN LIBRARY) was dismissed under the fiduciary shield doctrine (dkt. 40).

Neil Levin was and is the artistic director and editor-in-chief of The Milken Archive of Jewish Music sponsored and supported by the Milken Family Foundation. In the past Levin was a full-time professor of music at the Jewish Theological Seminary and has been professor emeritus since approximately 2011. See http://www.milkenarchive.org/artists/view/neil-levin.

The Posen Foundation is a Swiss equivalent of a U.S. not-for-profit. The Foundation was established in 2004 by Felix Posen, who at all relevant times served as its president. It is funded by Posen and his family. Its mission is to work internationally to advance Jewish education and promote Jewish culture in the public sphere. It awards fellowships, hosts public events, and supports Jewish scholarship in the area of modern Jewish history and culture.

A project of The Posen Foundation, begun about 2004, is publication of the first ten volumes of the POSEN LIBRARY. The POSEN LIBRARY was described by the Foundation on its website in 2008 (a copy was provided to Levin) as follows:

> A project of enormous scope and importance, the Posen Library of Jewish Culture and Civilization is an anthology of important literary works produced primarily by Jews from the Biblical period through the end of 2002. Under the guidance of Editor-in-Chief James E. Young, 120 internationally recognized scholars are contributing to this project, which will include primary sources, documents, texts, and visual images. Published by Yale University Press, the first volume of The Posen Library will be completed in 2009; an additional 11 volumes will be published by 2013.[3]

---

[2] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

[3] The first volume of the POSEN LIBRARY, Volume 10, covering the period 1973-2005, was published by Yale University Press in November, 2012. A Posen Digital Library, which includes material from Volume 10 of the POSEN LIBRARY, can be found at http://www.posenlibrary.com (hereinafter, the

James Young, a professor at University of Massachusetts – Amherst and the first editor-in-chief of the POSEN LIBRARY, held that position at all relevant times. As of 2008 he was receiving $18,000 per year to serve as editor-in-chief.

In or about 2008, the Posen defendants were exploring ways to secure rights to recorded music for use within, *inter alia*, Volume 10 of the Posen Library by exploring a collaboration with the Milken Foundation. (Young in an email to Joyce Rappaport, executive editor of the Posen Library, also expressed interest in providing links to works already on line, such as through the Milken Archive or the University of Pennsylvania's archive.)

On October 27, 2008, Rappaport sent an email to Paul Schwendener, chief operating officer of the Milken Archive, to inquire about the possibility of working with the Milken Archive. Rappaport explained,

> Each volume [of the POSEN LIBRARY] will be accompanied by CDs, DVD's, or Web-based links that will include examples of music, art, film and dance. As our volume editors have gathered their potential music selections for the contemporary period, they have discovered that the Milken archive has probably preserved many of the items that they hope to use. In addition, it has been suggested that Milken may be organizing future projects that might also be available for us as well.

Schwendener forwarded the email from Rappaport, together with information gathered about the Posen Foundation and POSEN LIBRARY, to Levin, who joined Schwendener at a meeting with Rappaport, and a POSEN LIBRARY consultant on November 11, 2008. Following that meeting, Rappaport sent the following email message to, among others, Young and Posen:

"POSEN LIBRARY website"). The POSEN LIBRARY website posts material from Volume 10, including a section titled "Musical Selections," at http://www.posenlibrary.com/frontend/music-dance-and-film-selections.

Dear Felix, James, and Jonathan,

Yesterday afternoon, Roberta Newman [the consultant] and I met with representatives of the Milken music archive. We talked for quite a while with Paul Schwendener, the Chief Operative Officer, and Neil Levin, the Artistic Director. They are quite enthusiastic about the possibilities of sharing their resources with the Posen Foundation.

The archives has a vast number of recordings, many of which they have made themselves. Those, in particular, might be open to an arrangement with us. Other items in their archives would, we think, still require permissions from the companies that produced them or the composers or estates.

I think this is worth pursuing. We do have some questions, though, about their involvement (particularly of Prof. Levin, who teaches at the Jewish Theological Seminary and who, I suspect, wants some role in writing or annotating). I also think that they would be a more effective resource--and probably an excellent one--for the earlier volumes. Was Levin ever considered as an adviser to the project? We could find out more about him from David Roskies, his colleague.

Neil Levin is going to be in London from November 21 through November 28 and would like to talk to the Posen Foundation. As I said, this may be worth the conversation. . . .

A POSEN LIBRARY Progress Report dated November 24, 2008, includes the following:

[W]e have to face the fact that the music alone for Volume 10 will cost anywhere from $20,000-$30,000 for just two-CD set. …[T]he issue of music and film rights led us to meet with representatives of the Milken Archive of American Jewish Music. … They are interested in discussing some sort of cooperation with the Posen project, not just for American music. [4]

Posen met with Levin in London on November 25, 2008. Levin advised Posen that the

list of musical selections for Volume 10 "had numerous faults" and "contained numerous

---

[4] Levin asserts that he gave "professional advice and counsel" at this meeting and that Rappaport asked him to complete an "evaluation of what direction [the Posen Foundation] was going in music." Schwendener, however, described the meeting as "exploratory":

"And it was just kind of, I think, a general getting … to know about each project. Sort of like they wanted to find out more what the Milken Archive was about, and Dr. Levin and I were going to find out what The Posen Foundation was doing and—it was sort of I would call it an exploratory meeting."

mistakes, mis-information, vulgar racial slurs and other tasteless, offensive and irrelevant material."

Levin asserts that Posen engaged him at this meeting to perform certain studies and other work for the POSEN LIBRARY, although his testimony was somewhat different. He stated that the meeting was "to get to know each other and for [Levin] to show his expertise … [for] Volume 10." Levin did not recall any compensation being discussed in that first meeting. At that meeting and thereafter, Posen instructed Levin to meet with Young and Rappaport.

Levin testified that he and Posen discussed his compensation and that Levin expressed his expectation to be compensated on a pro rata basis based on his $300,000 salary, which came to $400 per hour. Levin left the November 25, 2008 meeting in London with the understanding that Posen had agreed to pay him at the rate of $400 per hour for approximately 16-18 hours per week of work for the Posen Foundation. Levin does not claim, however, that Posen explicitly promised $400 per hour.[5]

Following the meeting, Posen sent an email to those working on the POSEN LIBRARY, including Young, in which he noted, "[Levin] is a very learned and knowledgeable gentleman." Posen expressed his concern about whether there would be a "practical solution as to how we might cooperate." He pointed out that the Milken Archive had perhaps more than 100 works written by composers over the past 100 years with which the Archive could possibly create its own anthology of Jewish music:

> The question we are going to have to struggle with is in what form do we wish
> to try and include music as part of our anthology ie just take some
> representatives pieces of music in each of say the 1st four volumes or merely
> refer to it in writing and leaving it to an outfit like Milken to possible create a
> full anthology of Jewish Music on their own.

---

[5] Levin's Amended Complaint does not allege that defendants agreed to pay him $400 per hour.

He recommended that the general editors and the volume editors should be involved in a "conversation about what to do about this issue."

On February 4, 2009, Levin met in New York with Young, Rappaport and Jonathan Brent, then the editorial director of the Yale University Press, the contracted publisher of the POSEN LIBRARY. Levin testified that he reported the initial research on his feasibility study and CD evaluation at this meeting. (Defendants dispute this testimony and rely on a February 15, 2009, email that Young sent Levin (and others) to memorialize what was discussed at the meeting. Quoting the February 15, 2009 email, Young stated,

> I would like to invite you, Neil, to join my own Editorial Advisory Board of Experts. … We are paying [the] Advisory Board members an honorarium of $3,000 for their assistance. Assistance in your case, Neil, would be to read the lists of music as they come in and to advise me of the lacunae, omissions, and suggestions for improvement. We've asked all vetting come to me and Joyce [Rappaport], so that I can assemble all suggestions and make them to the Volume Editors on behalf of my entire Editorial Board. This also lets you be as frank and open as you need to be, without fear of offending Volume Editors or personalizing suggestions.
>
> * * *
>
> We agree that there may be a need for an "11th Volume" of Music for the Posen Library . . . .

Young forwarded to Levin the Posen Library's "Project Guidelines for Volume Editors," although Levin testified that he had no recollection of receiving them. The Guidelines reflect that each volume was limited to 1,000 printed pages and that volume editors would "have to exercise their judgment in determining the total number of entries, deciding how long selections will be in the hard copy, and which might be included in the accompanying CD." The Guidelines state that volume editors would receive a stipend of $25,000 (in three installments) for their work on a single volume.

Levin met again with representatives of the POSEN LIBRARY, including Young, on or about May 20, 2009 in New Haven. In an email dated May 24, 2009, from Young to, among others, Levin, Young wrote, "I think we've hammered out both a consulting and a collaboration agreement with Neil …."  Further, he wrote,

> … We welcome Neil to our Editorial Advisory Board of Experts as its musicologist, for which we will pay him a consulting fee consistent with his contribution to the project. …[Levin's] "most immediate job will be to vet and refine the final list of music related entries for Volume X." Levin also would suggest a list of essays "and the appropriate 1,000-word extracts for the printed version of Volume X" and work on a collaboration with the Milken Archive and Yale University Press which could, if successful, result in a "stand-alone anthology of World Jewish Music.…

Although Young's email did not include the understandings Levin believes were reached at the meeting, Levin testified that at this meeting he "shared the results of his feasibility study and CD evaluation" and that he was also assigned the role of music editor with sole authority over all music-related content in the entire POSEN LIBRARY.[6]  Young and Posen testified that the volume editors had "the final call" on what was included in the final publication.

In a May 24, 2009 email Young summarized the understandings reached at the same meeting, including that Levin would join their editorial advisory board and would be paid a "consulting  fee consistent with his contribution to the project."

In response to Young's May 24, 2009 email, Posen inquired if "anything [was] discussed about finance at all?" (Fischman Decl. Exhibit 16) Young responded,

> In general terms, we agreed that Neil would be paid an Editorial Board Consulting fee, as we've done for other experts. There has been a $3,000 fee for close vetting in particular areas like art or music. In Neil's and Edwin Seroussi's case, however, they may demand (and deserve) more. He's basically going to re-make the list of music and essays on music for Volume X, in collaboration

---

[6] Defendants deny that he was given sole authority over the music content of even volume 10 and point out that there is no documentation of this professed promise.

with Seroussi (a Hebrew University musicologist and specialist in Israeli and Mizrahi music).[7]

By email dated May 27, 2009, Levin wrote to Posen the following:

I had a very good and, I think, fruitful meeting last week [May 20] in New Haven. … I do believe now that we all understand what has to be done on several levels – with regard both to the substantive content matters vis-à-vis music-related writings as well as illustrative music itself for each (or most) of the volumes. . .

Posen responded in agreement that there had been "a good and fruitful meeting between all of you."

Levin met Posen again in London in June 2009. Posen reported on that meeting in an email dated June 8, 2009, which reads as follows:

I spent about 4 hours with Neil, the end result being that he is to write up a proposal, which hopefully we will have in our hands by the end of this month.

As you know, Neil is very long-winded, but also very knowledgeable and learned in this field, and it is pity we did not make contact with him earlier. I made it clear to him that we need to get going on this very quickly if we are going to do anything at all with him, respectively Milken, as this project has been underway since 2000 and we are anxious to publish. I am not at all sure he will react to this urgency as I do not think speed is his forte. …

What is, however, obvious is his expertise, which I think may be unique in the Jewish music world. He gave me a copy of the five sheets someone prepared for Volume X, entitled "Music selected by Editors to represent the period", and showed me some of the errors therein.

There is not much we can do now except wait, and if I do not hear anything within the next 2-3 weeks, I will chase him again. Instinct tells me we really do need him, and I will do everything possible to try and work with him, and keep you informed.

---

[7] Levin points out that Young had misunderstood Posen's inquiry. Posen had not meant to ask about compensation for Levin but rather the "possible costs of items which we might want to get from the Milken Archives." Nonetheless, Young's email reflects his expectation that Levin might be paid more than $3,000.

Although there had been a few email exchanges after June 8,[8] Rappaport sent Levin the following email on September 1, 2009, stating, "I spoke with Felix Posen today and he expresses concern about the pace of our progress. He asks that you please submit your suggestions for the list of music in the next week or so, so that we can consider these additions."

By email dated September 25, 2009, Levin supplied Posen with information, described as "both an encapsulation and an expansion of what we discussed at our initial meeting." He expressed his desire to preside over the musical and music-related content of all ten volumes in an official capacity of "music and musicology editor of the series." Levin also noted, "It is important to underscore that I am well aware that this is an anthology of all aspects of Jewish culture and civilization, so that the musical component must be selective rather than comprehensive or exhaustive. But in order to select and determine the best examples in each category, my procedure is first to consider the full range of possible candidates."

Posen responded to Levin on September 20, 2009,

Dear Neil,

I acknowledge with thanks receipt of your message which indeed contains the sort of information I had hoped you would come up with many months ago. I now understand what it is you have in mind. …

Assuming you can really finish at least what we need for volume 10 (as you know we have more time for the rest of the volumes) by end November so that we can get YUP to publish Volume 10 next year (everything else is ready except music) then we would be happy to offer you the position of Musical Editor with a flat fee of US 12,000 – and also agree with your request that we engage Seroussi for Volumes 9 & 10 to help generally with additional titles – particularly popular Israeli music.

---

[8] On June 8, 2009, for example, James Young wrote to Felix Posen: "He has in his hands our specific proposal for his work on Volume X, which is our first priority. With a list of music on the table, we can then decide how and which to include in CD's and which in auto-streaming on- line."

Edwin Seroussi was retained to work on the POSEN LIBRARY. He submitted an invoice for $2,500 for his services. His work included preparation of "listing of Israeli popular and commercial music for Volume X."

On October 6, 2009, Levin supplied "a random listing of sources/source reading that I would envision in an 11th volume of the Posen Library." (In this communication, Levin noted, "Whether or not there would be [ ] an 11th Volume, I believe that it is crucial that each of the ten volumes include a FEW such source readings.")

Posen forwarded the material to Young and Rappaport by email dated October 7, 2009, with a copy to Levin. In that email, Posen asked Levin if this "is the list of MUSICAL entries for Volume X?" Young, in response, noted that the material from Levin was "impressive" but that "we have to keep him focused on Volume X. He seems to be proposing an 11th Volume." According to Young, "[t]he next step is to get [Levin's] list of MUSICAL entries for Volume X."

By letter dated October 8, 2009, Levin advised Brent at Yale University Press that he had spoken with Posen:

> According to Felix, there is no commitment or decision to include ANY accompanying music on actual recordings, OR to have a website (although I believe I persuaded him of the necessity of a website -- so he said!). He says this is all speculation, and that all he would want me to do at this point is to create exhaustive listings of music in each category, without regard to their inclusion as part of the Posen Library--and without even knowing if recordings exist--i.e., a music bibliography.

> By email dated October 7, 2009, Posen advised Levin as follows:

> Dear Neil,

> We had a pow wow last few days and the decision is clear. First and foremost, please finish as fast as you can what you think should go into vol 10. When that is done - need the same for vol 9 and other volumes. Once we see the totality of what you have in mind we shall then decide among us all including YUP whether

we should consider an extra volume or not. We may make up our mind already a bit earlier ie once we see the complete list for vol 10 and 9. What is critical from a time point of view is to finish vol 10.

Is all this clear or do you have additional questions? Feel free to always call on me and if I am not available then please I call James or Joyce with whom I am in constant contact so that everything is coordinated.

Levin responded to Posen by email on October 11, 2009, as follows:

Musical entries, however -- Bibliographic listings of COMPOSITIONS, SONGS, ETC., NOT MUSIC-RELATED WRITINGS -- could probably be accomplished by a press deadline if we were able to get going right away, and if I were to have provision for the necessary assistance.

On October 12, 2009, Posen responded to Levin:

Just in case we do not reach each other today, let me reiterate what I intend to discuss with you today and where we stand today. I am in all evening today.

All Volume Editors (VEs) know that all parts of Jewish culture are to be included. They have and are including very representative lists of art, architecture, photography, drama etc. It is also evident that in 1000 pages each, there is only so much room for each of these genres. IF we will consider a separate spin-off volumes for all the non literary genres such as music, art and drama etc. we shall sometime in the future have to consider how many volumes we may need for that.

At this moment the ONLY research we need from you IMMEDIATELY is a final list of music entries for Volume X. To help you focus you should immediately prepare say a list of the most important 20 or so titles of musicological essays for volume X and a list of say 120 of the most important musical entries including all the genres you have already started to identify. There is no point at THIS MOMENT for you to list say 500 entries or include excerpts from 100 musicological essays — anymore than we can do this for literature, art or religious thought.

Separate Spinoff volumes may be considered in due course — who knows maybe one each perhaps for music, art, drama etc. I do not want you to NOW concentrate on such a possibility.

I hope this is now crystal clear and will allow you to do whatever you can in the barely three weeks left.

Let's still try and talk today and if it does not succeed then tomorrow. Regards, Felix

Levin wrote to Posen on October 28, 2009, "I am proceeding with work on assembling the lists of titles for Volume X . . . ."

According to Levin, he spoke with Posen on or about October 31, 2009, and in that conversation Posen "offered Professor Levin [as music editor of all volumes] what Mr. Posen said was the same remuneration as that of the Volume Editors, $25,000 per volume times the ten (10) principal volumes." There are no contemporaneous documents referencing this claimed agreement.

Levin testified that his duties as music editor would include selecting and abridging the music-related writings.

Levin supplied the POSEN LIBRARY with nine proposed writings in early January 2010. Levin's writings consisted of edits to works by other scholars, for example, one was an abridged version of an article by Mark Slobin titled "*American Klezmer Its Roots and Offshoots*."

By email dated February 5, 2010, Rappaport stated to Levin that she might have to ask him to shorten some of the articles he had submitted and inquired about the status of the bibliographies:

> For the [music bibliographies], could you create an annotated list that includes the composer or musician's name, year of birth and death, place of birth, short characterization, and the major works (not more than three: here you could even include the source of the best recording, if relevant). You could also include the occasional illustration, such as music score, LP cover, or other relevant photo…. We would ask you to consult the prior list that [the volume editors] submitted, so that we can include the popular artists as well. We envision a list of perhaps 130 names.

> In response, Levin advised,

> Since the 5th February email, I had been waiting to hear which if any [writings] would be suggested for further shortening, if possible. Anyway, in the intervening period I did glance over all of them again, and I don't see how any could survive further abbreviation and still be coherent and make sense in terms

of context. If you would let me know of any specific ones that you or the others involved have in mind, I will certainly take yet another, closer look.

Levin indicated it would be better to include the biographical information in the "separate music-related volume" they had previously discussed.

Young wrote to Rappaport stating, "The list of music Neil is sending us in electronic form will be lengthy, but asking him to cut now will only delay the delivery of it." Young also testified that, because Levin had suggested that he couldn't edit it down, he "may have said, just give us the list you have, then, whatever they are, and we'll see how we can use them." According to Young, the POSEN LIBRARY was "hoping" to use parts of the bibliographies that could not go into Volume 10 in some manner, such as placing a complete bibliography online in some form.[9]

Levin transmitted five bibliographies to Rappaport from April through September, 2010.

By email dated April 14, 2010, Levin inquired if they were on the same track in terms of space limitations, indicating that it would help to know the space limitations.

By email dated April 22, 2010, Young complimented Levin on the portions of the materials he had submitted and urged him to finish the remainder of the work promptly.  He added,

> We're reaching our absolute word-count limit for this volume, which means that the full list of musical entries will most likely have to be cut by some measure …. As you proceed, knowing that some 20% may have to be cut, you may do some degree of pre-editing as you assemble these last lists."[10]

---

[9] According to Young, "Spillover, you know, might go online, so that we have a complete bibliography online in some form." There is an online platform for the *Posen* Library, but because Levin did not allow use of his bibliographies they do not appear on the website with the music-related material.

[10] Levin did not see this email until at the earliest May 19, 2010.

On September 3, 2010 a volume editor for Volume 10 reported to Rappaport her comments on Levin's lists (Levin asserts that his final list of 945 entries was submitted on September 8, so this review may not have been of the entire submission).[11]

Thereafter, Levin was asked to select 40 entries from his bibliographies to include in the published Volume 10, but he refused and would not allow the *Posen Library* to use his name.

In the end, the initial list of music shown to Levin in October 2008 was used in Volume 10. That list also appears on the POSEN LIBRARY website. Volume 10 does include the four of the nine abridged writings that Levin submitted. (Copyright permissions were separately obtained.) By the end of the relationship between the parties, there had been no meetings and no collaboration with the Milken Foundation.

Levin is not listed as a member of the advisory boards or project staff in Volume 10.

Although Dr. Levin submitted draft collaboration proposals to the Posen Foundation in July, 2009, there were no meetings or collaboration with the Milken Archive, and no recorded music from the Milken Archive was used in the POSEN LIBRARY. According to documents produced in response to a subpoena from the Posen defendants, the Milken Archive rejected a proposal to work with the POSEN LIBRARY.

Levin has experience in writing articles for academic journals. He conceded that "[n]oone is paid for an academic article in -- in journals. … For an academic journal, one is not only not paid, sometimes the editor is not even paid. It's totally an academic exercise . …"

Levin testified that he had, on occasion, received honoraria for submissions to academic journals. But he also testified that an honorarium would not apply to the type of work he was

---

[11] Levin disputes that his submissions were reviewed by the volume editors.

retained to do for the POSEN LIBRARY because "[t]his is professional consultation for a—a project that's costing a lot of money, and nobody's doing charity work for it."

Other than with Posen at the London meeting in November, 2008, Levin never discussed a $400 per hour financial arrangement with anyone, including Young. He never memorialized the agreement in any writing, nor did he ever submit an invoice for work at the $400 per hour rate. Levin had never worked for an hourly fee for anyone before his meeting with Posen.

Levin never submitted any request to be reimbursed for his own expenses, although he did submit one request for reimbursement for the work of a research assistant.

## ANALYSIS

The court applies the familiar legal standards for summary judgment motions to determine whether a genuine issue of material fact exists requiring trial. See Fed. R. Civ. P. 56(a); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).[12]

**Implied Contract**

Although it is undisputed that a written agreement was never reached between the Posen Foundation and Levin, Levin argues that there was an implied contract between them for services to the POSEN LIBRARY. He seeks compensation for this work on a *quantum meruit* basis for the alleged value of his services to the POSEN LIBRARY. Defendants contend that there is no genuine issue of material fact that the defendants did not publish or use the bibliographies,

---

[12] In short, the court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). In response, the party who bears the burden of proof on a particular issue must affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Day* v. *N. Ind. Pub. Serv. Co.*, 987 F. Supp. 1105, 1109 (N.D. Ind. 1997); *see also Insolia* v. *Philip Morris, Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

neither did the POSEN LIBRARY list him as an advisor to Volume 10, and therefore the Posen Library received no benefit for which it is obligated to pay Levin. Levin responds that the measure of value should not be based on whether his work product was used but, rather, whether by asking Levin (repeatedly) to submit writings and bibliographies and accepting them (even though not in the form wanted by the Posen defendants), he should be paid regardless of whether the materials were published.

*Quantum meruit* means "as much as he deserves" and is based on the implied promise of a recipient of services to pay for the value of those services. *Carlton at the Lake, Inc*. v. *Barber*, 928 N.E.2d 1266, 1272, 401 Ill. App. 3d 528, 340 Ill. Dec. 669 (Ill. App. Ct. 2010) (quoting *First Nat'l Bank of Springfield* v. *Malpractice Research, Inc*., 688 N.E.2d 1179, 1185, 179 Ill. 2d 353, 228 Ill. Dec. 202 (Ill. Ct. 1997)) (internal quotation marks omitted).[13] "A party seeking recovery on a *quantum meruit* theory must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's retention of the benefit in the absence of any compensation." *Id*.

It is undisputed that defendants requested Levin to submit writings and bibliographies for use in Volume 10 and that Levin submitted writings and bibliographies for use in Volume 10. Thus the first element of proof is established. Whether defendants received any benefit from Levin's service, however, can be determined only by findings of fact concerning which version of the facts is believed: (a) Levin's version that he had been given full authority over the music content of the entire POSEN LIBRARY or (b) the defendants' version that he was engaged only for Volume 10 and that they retained complete authority over the final content of the POSEN LIBRARY including Volume 10. If a reasonable jury believed (a), it could find that defendants

---

[13] The court assumes that Illinois common law applies since neither party has argued to the contrary.

caused their own inability to use Levin's submissions by failing to honor their commitment to give Levin complete control over content and, as a result, equity requires that he be compensated in the amount he deserves, as determined by the jury. If the jury were to accept defendants' version, it could conclude that Levin rendered his work useless to defendants by refusing to allow the defendants to edit and abridge the materials subject to their editorial control, in which event Levin would likely deserve little or nothing. Although defendants rest heavily on the representations made in back-and-forth emails and the lack of any documentation of Levin's understandings, the fact remains that the relationship between the parties was largely oral, the terms of an agreement were never formalized, and the dynamic between the parties evolved over time. A great deal of the evidence depends on the credibility of the witnesses. As such, the *quantum meruit* claim must be submitted to a jury.

**Fraud**

Defendants argue that they are entitled to summary judgment on Levin's claim of fraud because Levin has failed to satisfy any of the essential elements of proof, starting with failure to identify any false statement or omission made to him. Levin responds that defendants made numerous false representations to him. First, Young stated that the Foundation would pay Levin a consulting fee consistent with his contribution to the POSEN LIBRARY, and Posen guaranteed him compensation comparable to his fee from the Milken Foundation but, in truth, he has been paid nothing. Second, Young falsely stated to Levin that his final work product would be cut by at most 20 percent and they would work with the volume editors of Volume 10 to incorporate Levin's work by cutting down some non-music-related selections and the Foundation would publish Volume 10 as two books. In truth, in October 2010, after Levin submitted his materials, defendants asked him to select 40 articles from his list of 947, a 96 percent cut. Third,

Defendants falsely represented that there would be a spin-off or eleventh volume of the Posen Library (apparently the second of the two volumes referred to in (2) above), but such a volume was never published. Fourth, Defendants falsely represented to Levin that he would have sole authority over all music-related content of the POSEN LIBRARY as music editor but, in fact, defendants permitted the volume editors of Volume 10 to make edits to Levin's submissions and only at the end of his services did they state that Levin did not have this authority.

As the court recognized in *Steinberg* v. *Chicago Medical School*, 371 N.E.2d 634, 641, 69 Ill. 2d 320, 13 Ill. Dec. 699 (Ill. Ct. 1977), "[a] misrepresentation in order to constitute a fraud must consist of a statement of material fact, false and known to be so by the party making it, made to induce the other party to act, and, in acting, the other party must rely on the truth of the statement." Acknowledging that "the general rule denies recovery for fraud based on a false representation of intention or future conduct,"[14] the court pointed to "a recognized exception where the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Id.* at 641.

The facts of this case would only fit into a promissory fraud theory because it is based on false representations of future conduct. Promissory fraud, however, is a disfavored cause of action in Illinois because fraud is easy to allege and very difficult to prove or disprove. *Hollymatic Corp.* v. *Holly Systems, Inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill. 1985). Even the burden on a plaintiff of pleading a claim of promissory fraud is high:

> In order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent—a scheme or device. If he cannot, it is in effect presumed that he cannot prove facts at trial entitling

---

[14] *See, e.g.*, *Willis* v. *Atkins*, 106 N.E.2d 370, 377, 412 Ill. 245 (Ill. Ct. 1952) (citing rule that "actionable fraud cannot be predicated upon the mere failure to perform a promise, though there was no intention to perform the promise when made").

him to relief. If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. Presumably, it is this result that the Illinois rule seeks to avoid.

"Scheme" is defined in *First Nat'l Bank of Ottawa* v. *Dillinger*, 897 N.E.2d 358, 360, 386 Ill. App. 3d 393, 325 Ill. Dec. 110 (Ill. App. 2008):

> In the absence of a statutory definition, words are to be given their ordinary and commonly understood meaning. Black's Law Dictionary defines 'scheme' as '[a]n artful plot or plan, usu. to deceive others.' Black's Law Dictionary 1346 (7th ed.1999). The Random House Dictionary of the English Language defines 'scheme' as 'an underhand plot; intrigue,' The Random House Dictionary of the English Language 1713 (2d ed.1987).

*Id.* The Seventh Circuit has indicated that "scheme" and "plan" are words of intention, and that the intention must be shown "at the outset" of the scheme. *See United States* v. *Brown*, 209 F.3d 1020, 1023 (7th Cir. 2000) ("Under this analysis, Brown must demonstrate that 'he either intended *from the outset* to commit [the] crimes or that he intended to commit one crime which, *by necessity*, involved the commission of [the others].'" (emphasis in original).[15]

Under these principles, the issue is whether a reasonable jury could find that from the outset Posen, Young, and others associated with the Posen Foundation planned or plotted to obtain and use Levin's submissions for no compensation by making the allegedly false representations Levin identifies. In light all the evidence before the court, viewed favorably to Levin, the court concludes that no reasonably jury could find fraud in this case.

---

[15] For examples of promissory fraud, *see Roda* v. *Berko*, 81 N.E.2d 912, 401 Ill. 335 (Ill. Ct. 1948) (a course of conduct covering a period of almost twelve years of pretense which led a homeowner to transfer title to her home to the defendant was a scheme to defraud); *Steinberg*, 371 N.E.2d 634 (false statements in official school catalog that induced plaintiffs to apply stated a claim for promissory fraud); *Carroll* v. *First Nat'l Bank of Lincolnwood*, 413 F.2d 353, 356–58 (7th Cir. 1969) (use of artifices to "peg the market" in certain securities and then unload them at a higher manipulated price that induced plaintiffs to finance purchase of securities was a scheme to defraud); *Howard* v. *Howe*, 61 F.2d 577 (7th Cir. 1932) (missuse of confidential and fiduciary relationship that induced employee to transfer patent rights was a scheme to defraud).

The record includes countless communications among individuals associated with the POSEN LIBRARY. Levin has not pointed to a single document or snippet of testimony indicating that those individuals were less than sincere in their efforts to collaborate with the Milken Archive and Levin, much less that they plotted against him.

Although Levin testified to several different (but inconsistent) promises of specific remuneration (at one time $400/hour, at another $250,000), he has no evidence other than his own testimony to support those claims, while defendants point to several instances in which they offered certain compensation for all or some of the work. All of these offers were for compensation dramatically lower than what Levin now claims he was offered. He made no contemporaneous protest that a different agreement existed, never submitted an invoice for payment for his services, and never demanded that the claimed terms be placed in a written agreement.

Furthermore, discovery revealed no instance in which the Posen Foundation paid other editors, consultants, or contributors, including Professor Seroussi, whose work may have been comparable, an amount similar to what Levin claims and no instance in which Levin had previously commanded such compensation as a consultant or contributor.

The remainder of Levin's claimed unfulfilled promises, even if made, are unenforceable standing alone, as none alone is a scheme. In short, the court finds no evidence supporting a claim of promissory fraud. Defendants are entitled to summary judgment.

**CONCLUSION**

Defendant's motion for summary judgment (dkt. 142) is granted as to plaintiff's claim of fraud and denied as to plaintiff's claim of breach of implied contract.

Date:   April 1, 2018

_____

U.S. District Judge Joan H. Lefkow